**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-cr-00088** |
| | ) | **&** |
| | ) | **No. 06-cr-00233** |
| | ) | **(RBW)** |
| **TIMOTHY L. JENNINGS, SR.,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**EMERGENCY**
**MOTION TO REDUCE SENTENCE PURSUANT TO**
**THE COMPASSIONATE RELEASE STATUTE**
**18 U.S.C. § 3582(c)(1)(A)(i)**

Mr. Timothy L. Jennings, Sr., through undersigned counsel, respectfully requests that this

Court grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) in light of his

age (63 years old), and his multiple diagnoses of heart disease, diabetes, and hypertension, each

of which put him at increased risk of death or serious complications from the coronavirus

(COVID-19).  The hospitalization and death rate for COVID-19 increases with age,[1] the virus

disproportionately affects African-Americans,[2] and "those at high-risk for severe illness from

---

[1]     World Health Organization (WHO), *Coronavirus disease 2019 (COVID-19) Situation Report – 51* at 2, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_8.

[2]     *See* Reis Thebault et al., *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, The Washington Post (Apr. 8, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows (hereinafter, "The coronavirus is infecting and killing black Americans at an alarmingly high rate").

COVID-19" are "[p]eople who have serious heart conditions," "diabetes," and "hypertension."[3] These co-morbidities raise Mr. Jennings's risk of serious illness and death from COVID-19, which has now killed 23 federal inmates and 1 staff member.[4]  As of April 22, 2020, the BOP reports that 760 inmates and 372 staff have tested positive.[5]  These numbers are undoubtedly an undercount, and it is only a matter of time before Mr. Jennings's institution, FCI Gilmer, sees its first case.  As a Vietnam War Honorary Discharge Veteran, Mr. Jennings is safest at home, utilizing his access to the Veteran's Assistance health facilities.  He therefore asks this Court to grant him compassionate release from FCI Gilmer so that he may shelter in place with his son in Baltimore, MD, rather than at the "petri dish[]"of an institution with 1,459 inmates and countless correctional officers, where the risks of infection cannot be overstated.[6]

In addition to the sentence in this case, Mr. Jennings was serving a consecutive 60-month sentence in No. 18-cr-17.  Mr. Jennings filed a *pro se* motion for compassionate release in that case, the government opposed, and Mr. Jennings, through counsel, replied in support.  **This**

---

[3]     WHO, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[4]     *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (last accessed 4/22/2020 11:41 a.m.); Cassidy McDonald, *She was promoted a month before her death. Coworkers say she was never moved into her new role, away from sick inmates*, CBS News (Apr. 20, 2020), https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/ (hereinafter, "She was promoted a month before her death").

[5]     BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (these numbers include 220 recovered inmates and 49 recovered staff).

[6]     *See* NPR, *Barr: Federal Prisons Mustn't Become 'Petri Dishes' For Coronavirus* (Mar. 26, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/26/822016191/barr-federal-prisons-mustnt-become-petri-dishes-for-coronavirus; *see also* BOP, *FCI Gilmer,*, https://www.bop.gov/locations/institutions/gil/ (last accessed 4/20/2020 11:47 a.m.).

compassionate release motion was granted on April 22, 2020.  *See* Ex. F - *United States v. Jennings*, No. 18-cr-17 (TSC), Order (Apr. 22, 2020), ECF No. 30.  Mr. Jennings will be on supervised release for a period of 36 months in that case.  In the instant case, Mr. Jennings received 24 months of imprisonment consecutive to the 60 months in No. 18-cr-17, to be followed by 12 months of supervised release concurrent o the 36 months of supervised release in No. 18-cr-17.  By the time of any grant in this case, Mr. Jennings will therefore have begun to serve his sentence in the instant case.  **Mr. Jennings therefore respectfully requests that this Court reduce his sentence to time-served, and amend his conditions of supervised release as provided in No. 18-cr-17.**

## BACKGROUND

Mr. Jennings, a Vietnam veteran suffering from Post-Traumatic Stress Disorder, was first diagnosed with bipolar disorder in 1977 and struggled with drug addiction most of his adult life, with periods of stability punctuated by relapses during which he would engage in criminal behavior.  Presentence Investigation Report ("PSR") at ¶¶138, 143; *see also United States v. Jennings*, No. 18-cr-17 (TSC), Def. Sent'g Mem. (Jun. 14, 2018) at 6, ECF No. 20.  In 2006, he committed a series of bank robberies, after which he pleaded guilty in this court to 6 counts of violating 18 U.S.C. § 2113(a) and was sentenced to 150 months of incarceration on each count, to run concurrently with one another, followed by three years of supervised release.  *See* No. 06-cr-00233 Judgment (Nov. 20, 2006), ECF No. 15.

During Mr. Jennings's incarceration, he was treated for his bipolar disorder.  *See* No. 18-cr-17 PSR at ¶118.  However, upon his release on March 3, 2017, but he had "no means" to buy the medications he needed.  *See id.* ¶¶87, 118.  Instead, he returned to crack cocaine, a drug he began using when he was 26 years old, and used almost daily until his arrest in 2006.  *Id.* ¶120.

Mr. Jennings remained drug free until July 2017, when he relapsed and used crack cocaine again for three straight days, after which he again engaged in a string of bank robberies for which he was charged in Case No. 18-cr-0017.  *Id.*

Mr. Jennings was charged by information in January 2018 with two counts of federal bank robbery in violation of 18 U.S.C. § 2113(a).  *See* No. 18-cr-17, Information (Jan. 26, 2018), ECF No. 5.  In April 2018, Mr. Jennings pleaded guilty to the two bank robbery counts, and in June 2018 the district court sentenced him to 60 months of imprisonment on both counts, to run concurrently, followed by concurrent terms of 36 months of supervised release.  *See* No. 18-cr-17, Plea Ag't (Apr. 12, 2018), ECF. No. 11; No. 18-cr-17, Judgment (Jun. 22, 2018), ECF. No. 23.

In July 2018, this Court revoked Mr. Jennings's supervised release and imposed 24 months of imprisonment for Counts 1-3, to run concurrently with one another and consecutively to the sentence imposed in Case No. 18-cr-17.  *See* Judgment on Revocation (Jul. 17, 2018), ECF No. 41.

In Mr. Jenning's PSR in Case No. 18-cr-17, VA Medical Center records verified diagnoses of "Type C hepatitis," "obesity," "benign essential hypertension," "diabetes mellitus, type 2," "osteoarthritis of knee," and "gastroesophageal reflux disease," among others.  No. 18-cr-17 PSR ¶115.  Medical records from the D.C. Jail indicated the following additional diagnoses: "coronary artery disease," "systolic heart murmur," "chronic low back pain," and "chronic heart palpitations."  *Id.* ¶¶116-117.  In May 2018, Mr. Jennings went to urgent care for heart palpitations and was referred to a cardiologist.  *Id.* ¶117.

On November 9, 2019, Mr. Jennings suffered a heart attack while incarcerated at FCI Gilmer.[7]  He spent 7 days hospitalized at a local hospital,[8] where he was informed that he has ischemic heart disease and would require a pacemaker, but that this small hospital was not equipped to perform this surgery because of his co-occurring conditions of diabetes and hypertension.  He was supposed to be sent to see a cardiologist, but the COVID-19 pandemic hit and he has not been taken to a cardiologist.  Mr. Jennings was also supposed to have surgery at this time on his right knee because his osteoarthritis had progressed to "severe," in which there is no or very little cartilage between the bones of the knee.[9]  This "bone on bone" condition causes "stiffness in the joint, constant inflammation, and less fluid around the joint," so that the individual experiences "more significant pain and discomfort while moving."[10]  "At this stage, surgical treatment is often the only option."[11]  Mr. Jennings was approved for the surgery, until an EKG was done on his heart, at which time he was told that he cannot be anesthetized since he has a bad heart condition.  Since his heart attack, Mr. Jennings has been out of breath constantly; he requires a bottom bunk, walks with a cane, may soon transition to a wheelchair, and is currently on the bottom floor of his prison because of his heart and knee conditions.

---

[7]     Mr. Jennings provided counsel with this information in an April 20, 2020 call.  Counsel has not yet received medical records, but will provide them to the Court upon receipt.

[8]     Mr. Jennings was unable to recall the name of the hospital he was at, except that it was a "Memorial Hospital" approximately 30 minutes away from Glenville, WV, but the details he provided make it likely he was taken to Stonewall Jackson Memorial Hospital.

[9]     Medical News Today, *The stages of osteoarthritis of the knee*, https://www.medicalnewstoday.com/articles/310579 (last accessed April 20, 2020).

[10]    *Id.*

[11]    *Id.*

On April 15, 2020, Mr. Jennings filed a *pro se* motion with the district court in No. 18-cr-271 for compassionate release. *See* No. 18-cr-271 Motion, ECF No. 25 (sealed). The government opposed the motion on April 18, 2020. *See id.*, Opp., ECF No. 27. Mr. Jennings, through counsel, filed a reply to the government's opposition on April 20, 2020. *See id.*, Reply, No. 29.

On April 18, 2020, Mr. Jennings, through counsel, requested compassionate release from the Warden of his facility, citing his age, race, heart condition, diabetes, and hypertension as co-morbidities for an increased risk of death or serious complications from COVID-19. *See* Ex. A (Comp. Release Req.).

Mr. Jennings is now 63 years old and has been imprisoned for approximately 33 months. *See* No. 18-cr-17 PSR at p.1 (arrest date of July 21, 2017). Including the 60-month consecutive sentence in No. 18-cr-17, his anticipated release date is July 8, 2023.

## APPLICABLE LEGAL PRINCIPLES

In the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons. Prior to this amendment, the BOP was the sole entity allowed to file such a request. Now, a defendant may file such a motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" First Step Act § 603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that—"

6

> (i)      extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)      the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the First Step Act and has not been amended to account for the statutory changes to § 3582. Accordingly, courts have held that "the most sensible interpretation of the Sentencing Commission's guidance in light of Congress's recent statutory amendments is that 'the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.'" *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction may be warranted if "the court determines that—"

> (1)      (A)  extraordinary and compelling reasons warrant the reduction; or
>
>         (B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)      the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)      the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

According to the Guidelines application notes, "extraordinary and compelling reasons exist" when, as relevant here, the defendant is (1) "suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required," *id.* appl. n. 1(A)(ii); or (2) "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process" "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," *id.* appl. n. 1(A)(ii).  Extraordinary and compelling reasons also exist when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  Id. appl. n. 1(B).  A sentence reduction may also be warranted for "[o]ther [r]easons," such as where "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his medical condition and/or age.  *Id.* appl. n. 1(D).[12]

---

[12]      To the extent that application note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply.  *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).  Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 2019 WL 2716505, at *9.  Even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present."  *Id.*

The Guidelines application notes further provide:

[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

*Id*. appl. n. 2.  They also recognize that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction."  *Id*. appl. n. 4.  Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances."  *Beck*, 2019 WL 2716505, at *8.

The BOP program statement on compassionate release is relevant only to the extent that its criteria are broader than those described in the Guidelines.  *See* U.S.S.G. § 1B1.13, appl. n. 1(D) (instructing that the Director of the BOP may designate *additional* "extraordinary and compelling reason[s]").  It generally parallels the policies in the Guidelines.  *See* PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) ("BOP Program Statement"), at pp. 4-7 (Jan. 17, 2019) (providing compassionate release consideration for inmates with "terminal" or "debilitated" medical conditions).  The statement also recognizes that a sentence reduction may be warranted for "Elderly Inmates," including those "age 65 or older who have served the greater of 10 years or 75% if the term of imprisonment to which the inmate was sentenced."  *Id*. at p. 6 (noting "[t]hese criteria are different from those provided in [§] 3582(c)(1)(A)(ii)").  *But see The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of Inspector General, U.S. Dep't of Just. ("*Aging Inmate Population*") at 45-46 (May 2015) (Rev. Feb. 2016),

---

at *9 & n.11; U.S.S.G. § 1B1.13 appl. n. 4.

https://oig.justice.gov/reports/2015/e1505.pdf (concluding that these criteria for elderly inmates are unclear, confusing, and overly-restrictive).

Notably, the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate." *Beck*, 2019 WL 2716505, at *6. Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of those reasons provided by the Commission or the BOP. Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2 n. 5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 2019 WL 2716505, at *5-6 (noting the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate"); *Cantu*, 2019 WL 2498923, at *3-5.

**ARGUMENT**

**I.   THERE IS A GROWING WAVE OF COVID-19 CASES AND DEATHS IN FEDERAL PRISONS.**

Like cruise ships and nursing homes, prisons are "closed settings [that] have long been known to be associated with high transmission probabilities for infectious diseases."  *See* Ex. B (DC Medical and Public Health School Faculty COVID-19 Letter) at 3.  "The close quarters of jails and prisons, the inability to employ effective social distancing measures, the use of shared toilets, sinks, and showers, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely."  *See* Ex. B.

FCI Gilmer may not have reported its first case—though, as noted below, it appears it has not tested anybody—but it is only a matter of time before it does.  .[13]  In fact, after two weeks of universal screenings on a labor and delivery unit in New York, 88 percent of those who tested positive were asymptomatic.[14]  And just like hospitals cannot control who enters and exits, staff and contractors are entering and exiting the prison at all times, with insufficient screenings of staff, contractors, and inmates (discussed further below).  There is also not enough testing in BOP facilities, of symptomatic, asymptomatic and presymptomatic individuals alike.[15]  And

---

[13]     Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[14]     Dena Goffman & Desmond Sutton, We tested all our patients for coronavirus — and found lots of asymptomatic cases, Washington Post (Apr. 20, 2020), https://www.washingtonpost.com/outlook/2020/04/20/we-tested-all-our-patients-covid-19-found-lots-asymptomatic-cases/.

[15]     Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html ("A federal judge weighing whether to order the release of hundreds of

there is insufficient personal protective equipment (PPE) in prisons,[16] with some staff either lacking the knowledge, or unwilling, to use the PPE that is available correctly: "All guards are now supposed to be wearing masks and gloves but some just wear their masks around their chin," one inmate has explained. "I guess they are not concerned about our safety."[17]

Notably, the social distancing measures in place in the rest of the United States—which are impossible in prison—are designed to "flatten the curve" of infections so that hospitals are not overwhelmed by a surge of cases.  Until a vaccine is developed, they do not themselves *stop* the spread of the virus; the virus will spread, but more slowly.[18]  What this means for FCI Gilmer is that, while it may take more time for the institution to see its first case, it will see its first case, at which time, because inmates live side-by-side in a closed building with recirculating air and touch highly-trafficked surfaces, the spread will be hard to contain.

---

inmates from a federal prison in Ohio where the coronavirus has quickly spread seemed keenly interested as to why the prison had so few tests.").

[16]     *See, e.g,* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits (hereinafter "Sick Staff"); Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus,* The Marshall Project (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

[17]     James Call, *Correctional officers file complaint about coronavirus at federal prison in Tallahassee*, Tallahassee Democrat (Apr. 17, 2020), https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/ (hereinafter, "Correctional officers file complaint").

[18]     Thomas Peuyo, *Coronavirus: The Hammer and the Dance*, Medium (Mar. 19, 2020), https://medium.com/@tomaspueyo/coronavirus-the-hammer-and-the-dance-be9337092b56 .

The best evidence that BOP cannot control the spread of coronavirus is that BOP has not controlled the spread of coronavirus.  As of 11:47 a.m. on April 22, 2020, the BOP reports that **760 inmates** (including 220 who have since recovered) and **372 staff** (including 49 who have since recovered) have tested positive for COVID-19, while **23 inmates have died**.[19]  Notably, "seemingly recovered patients" can "retest[] positive" for COVID-19[20] and "at least a proportion of recovered patients still may be virus carriers."[21]  BOP first began issuing medical and screening guidance in January and February, it instituted a nationwide lockdown on March 24th, and yet, BOP's self-reported numbers continue to rise.[22]

---

[19]     *See* https://www.bop.gov/coronavirus/.

[20]     CNN, *More than 140 seemingly recovered patients have retested positive for Covid-19, says South Korea* (Apr. 16, 2020), https://www.cnn.com/world/live-news/coronavirus-pandemic-intl-04-16-20/h_5fa6905b7b9aa8dd59305694147d605f

[21]     Stephanie Pappas, *Can people spread coronavirus after they recover?* Live Science (Feb. 29, 2020), https://www.livescience.com/coronavirus-spread-after-recovery.html (quoting researchers based in China whose study about reinfection was published in the journal JAMA).

[22]     The Federal Defenders of New York, Southern and Eastern, update these statistics daily: https://federaldefendersny.org/.



BOP-Reported Positive Tests for COVID-19 Nationwide[2]

| Date | Number of BOP Cases[3] |
|------|------------------------|
| 3/20/2020 | 2 |
| 3/21/2020 | 3 |
| 3/23/2020 | 6 |
| 3/24/2020 | 9 |
| 3/26/2020 | 18 |
| 3/27/2020 | 27 |
| 3/29/2020 | 38 |
| 3/30/2020 | 52 |
| 3/31/2020 | 59 |
| 4/1/2020 | 94 |
| 4/2/2020 | 114 |
| 4/3/2020 | 141 |
| 4/4/2020 | 174 |
| 4/5/2020 | 197 |
| 4/6/2020 | 259 |
| 4/7/2020 | 313 |
| 4/8/2020 | 377 |
| 4/9/2020 | 408 |
| 4/10/2020 | 481 |
| 4/11/2020 | 520 |
| 4/12/2020 | 541 |
| 4/13/2020 | 589 |
| 4/14/2020 | 694 |
| 4/15/2020 | 731 |
| 4/16/2020 | 752 |
| 4/17/2020 | 761 |
| 4/18/2020 | 784 |
| 4/19/2020 | 804 |

On Monday, April 13th, BOP's website showed 40 facilities with infections.  As of April 22, 2020, 61 facilities are listed as having infections:[23]

---

[23]     *See* https://www.bop.gov/coronavirus/  (accessed Apr. 22, 2020 at 12:06 p.m.).



And while the absolute number of infected inmates and staff is lower than the total

positive cases in the United States, the rate of growth of positive cases within the BOP is much

higher:[24]

Percentage of Increase of Infected BOP People (Inmates and Staff)
Since 3/20/2020[25]



---

[24]     The Federal Defenders of New York, Southern and Eastern, update these statistics daily:
https://federaldefendersny.org/.

[25]     National numbers obtained from www.cdc.gov and https://coronavirus.jhu.edu/map.html.

Number of Reported COVID-19 Cases in Bureau of Prisons[1] and the
United States[2], Compared by Days since First Reported Infection

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |
| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |
| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |
| Day 32 | 4/20/2020 | 816 | 2/22/2020 | 15 |

The BOP's rate of infection is even greater than China's and Italy's:



These statistics, as bad as they are, appear to drastically underreport what is actually happening. The BOP finally confirmed last week what many advocates had long suspected: "**that the bureau's case tracking does not include the privately run prisons,**" which have "**a combined capacity for nearly 17,600 inmates.**"[26] The Bureau "did not say why,"[27] and indeed there is no reasonable explanation except that the BOP wants to artificially keep the numbers low. "'This is just another example of dereliction of duty as it relates to the safety of that population that's incarcerated by our government[.]'"[28]

---

[26]    Dan Kane, *A second federal prison in NC has coronavirus cases, and U.S. officials aren't tracking it*, News & Observer (Apr. 19, 2020), https://www.newsobserver.com/news/local/article242125516.html.

[27]    *Id.*

[28]    *Id.*

On Friday, April 17, 2020, a 39-year-old staff member at USP Atlanta died suddenly in her home of COVID-19.[29]  The BOP apparently confirmed the same to news outlets, but as of 10:44 a.m. on Wednesday, April 22, 2020, the BOP had failed to include this staff member on its COVID-19 website.[30]  Importantly, the press reports that, according to a news release provided by the prison (but not anywhere accessible to others), the deceased staff member "had been successfully screened prior to entry [into the prison] and was asymptomatic" the Friday before she was found dead in her home.[31]  Indeed, "four correctional officers at USP Atlanta [] complained of insufficient access to protective equipment and inconsistent communication about how many staff and inmates were infected at any given time."[32]

That the BOP wishes to keep the numbers low at the expense of accuracy, transparency, and staff and inmates' health is supported by the fact that, in at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[33]  In another, the president of the correctional officers union estimates

---

[29]     *She was promoted a month before her death.*
https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

[30]     *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (last accessed 4/22/2020 10:57 a.m.).

[31]     WSBTV.com News Staff, *Atlanta Federal Penitentiary employee found dead tested positive for coronavirus,* WSBTV (Apr. 17, 2020),
https://www.wsbtv.com/news/local/atlanta/atlanta-federal-penitentiary-employee-found-dead-tested-positive-coronavirus/UMVOBY6WZVCKHEOGLBHAIESLHU/.

[32]     *She was promoted a month before her death*,
https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

[33]     Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020),
https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-

inmate infection at 600% of BOP's public number.[34]  One BOP employee told news reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[35]  At one facility where six inmates have already died of COVID-19, which houses a total of 2,421 inmates, the government recently revealed that the facility only had 55 coronavirus tests, had only actually tested 37 inmates, and had only recently received 25 additional "rapid tests," though it now expected 25 more each week.[36]  Indeed, at this facility, while the BOP lists on its website that there are 59 confirmed cases, "[o]fficials suspect another 207 have it."[37]  Mr. Jennings reports that *no one has been tested at his facility at all*, which makes the BOP's reports of zero cases at his facility problematic.

---

inmates-for-coronavirus-due-to-sustained-transmission/  (hereinafter, "Louisiana Prison No Longer Testing") ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

[34]     Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/  (stating that BOP was reporting just 10 inmate infections, but the union president had said management inside the prison gave "different numbers": 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, three dead).

[35]     *Louisiana Federal Prison No Longer Testing*, https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/.

[36]     Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html.

[37]     *Id.*

In view of both the numbers and what is missing, what the government claimed in opposition to Mr. Jennings's compassionate release motion in No. 18-cr-17 rings especially hollow.  It claimed that "BOP institutions, as a matter of policy and procedure, have pandemic plans for preparedness in the event of any infectious disease outbreak," and "BOP has a plan in place to protect inmates, including defendant."   No. 18-cr-271 Gov't Opp. at 13-14.  That the "BOP has been planning for potential COVID-19 transmissions since January," *id.* at 9, makes its failed response at FCI Oakdale, which saw its first case in March 2020, a particularly devastating tale.

After Oakdale's first positive inmate, Patrick Jones, died of COVID-19, a union representative at FCI Oakdale recounted that "[t]he bureau [only] last week banned family and friends from visiting inmates, but the officers' union had lobbied the federal prison system to take this action *for weeks* to keep the disease from infiltrating the prison walls."[38]  The union representative explained that "staff also asked prison officials — weeks before the first coronavirus case — to shut down a prison labor program within the facility," but that the program "was not shut down until after the first inmate tested positive."[39]  When one staff member questioned the warden about the possibility of COVID-19 coming to that facility, the warden responded, "'Oh, no, because we live in the South, and it's warm here. We won't have any problems.' . . .  Nobody gave us new direction on what we should be doing, how we should

---

[38]     Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana*, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (emphasis added) (hereinafter, "Explosion of Coronavirus Cases Cripples Federal Prison").

[39]     *Id.*

be preparing, what to look for, anything."[40]   Then, when Mr. Jones first exhibited COVID-19

symptoms, he was given a mask on his way to the hospital, but the two staff members who took

him were deliberately told he only had asthma, and given no protection: "No one told us he

might have Covid-19."[41]   And the two staff members were then cleared to return to duty 2 days

later.[42]   One correctional officer explained that:

> Most of the [correctional offciers] that tested positive were either working in the
> housing units or sitting on Covid-19 patients in the hospital. In the housing units,
> they were only wearing surgical masks. They say if you work in an isolation unit,
> you must wear an N95, but where do you think these inmates are coming from?
> They're coming from a housing unit where they won't give [the officers] that mask.
> That's our biggest [complaint]. How is it that you don't wear the N95 mask where
> the symptoms originate from? If an inmate gets sick in this area and lives in that
> area, you don't wear a mask, but if you put him in an isolation area, you wear a
> mask. [43]

After this bungled response, "people [keep] getting sick back to back to back to back."[44]

Oakdale has now had an additional 6 deaths.

Echoing these accounts of FCI Oakdale, "more than a dozen workers in the Bureau of

Prisons" have reported that "federal prisons are ill-prepared for a coronavirus outbreak.  Many

---

[40]      Janet Reitman, *'Something Is Going to Explode': When Coronavirus Strikes a Prison*,
N.Y. Times (Apr. 18, 2020),  https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-
prison-coronavirus.html (hereinfter, "Something is Going to Explode").

[41]      *Id.*

[42]      *Id.*

[43]      *Id.*

[44]      *See Explosion of Coronavirus Cases Cripples Federal Prison*,
https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-
prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

lack basic supplies like masks, hand sanitizer, and soap."[45]  Staff at one low-security facility described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[46]  In fact, an OSHA complaint filed by correctional officers at a federal women's prison in Tallahassee reports a "lack of masks and other personal protective equipment during the coronavirus pandemic."[47]  After "[w]eeks of requests from the [correctional officers'] union[] for a supply of protective equipment like masks and gloves," anger "boiled over when officers were supplied with what they call counterfeit N95 masks."[48] The president of the union reported that "[n]one of the labels, logos, the lot number, the inspection number ... none of that stuff was on there"; "[i]t makes no sense," he added, "We spent thousands of dollars ordering masks and nobody checked the legitimacy of them to make sure they were real or came from a credible vendor."[49]

In fact, BOP's modified operations touted by the government, *see* No. 18-cr-17 Gov't Opp. at 10, 14,  are facially insufficient and—as the increasing number of positive cases demonstrate—all but ensure the rapid transmission of COVID-19 within its facilities.[50]  First, the

---

[45]     N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (last updated April 17, 2020, 8:24 A.M. E.T.) https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[46]     *See Sick Staff*, https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federalinmates-as-coronavirus-hits.

[47]     James Call, *Correctional officers file complaint about coronavirus at federal prison in Tallahassee*, Tallahassee Democrat (Apr. 17, 2020), https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/.

[48]     *Id.*

[49]     *Id.*

[50]     BOP, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on 4/17/2020).

modified operations do not sufficiently address presymptomatic or asymptomatic spread of COVID-19 among staffers, contractors, and inmates.  For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening."[51]  And this "enhanced screening" only requires temperature checks and self-reporting of symptoms—it does not require testing (and could not since tests are in short supply), or for staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people.  Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these "enhanced screenings" are simply inadequate.  The screening tool used for prison contractors is similarly defective.[52]  Moreover, there is still inmate, staff, and contractor movement: staff do not live at the prisons; essential contractor services allowed into and out of prisons are "for example, medical services, mental health services, religious services and critical infrastructure repairs"; and "the BOP may need to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources."[53]  As one correctional officer stated about the "enhanced screenings" for staff,

---

[51]     *Id.*

[52]     BOP, *Visitor/Volunteer/Contractor Covid-19 Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf.  For example, the contractor screening tool asks contractors whether they have traveled to China, Iran, South Korea, Italy, and Japan in the last 14 days, but does not screen those who have traveled to, for instance, Spain (184,948 cases), France (147,113 cases), Germany (138,273 cases), or elsewhere in the United States (671,493 cases).  *See COVID-19 Map – Johns Hopkins Coronavirus Resource Center*, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html  (last visited Apr. 17, 2020).  This tool also fails to screen for pre-symptomatic spread or whether contractors are practicing social distancing.

[53]     BOP, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp.

> Originally, they gave us a form, and it asked if you'd been exposed, if you had any symptoms, if you had seasonal allergies, how long you had seasonal allergies. Now all they're doing is checking our temperature. You pull up, they put a little forehead thermometer and check your temperature: "OK, you want a mask and gloves? Go on in." No "How are you feeling? Do you have body aches, are you nauseated? Do you have a cough, a runny nose, any of that?" We're not questioned at all.[54]

Another opined that "they're going to make the excuse of 'We're doing enhanced screening to catch it, come back to work.' That's their answer. Is it the right answer? Hell, no, it's not the right answer."[55]

Moreover, the BOP provides conflicting information about inmate screening. It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days.[56] But the inmate screening tool does not reflect this process, instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone *diagnosed* with COVID-19 in the last 14 days.[57] Indeed, Mr. Jennings reports that inmates coming into FCI Gilmer have noted that they were quarantined upon their arrival, but not for 14 days. Phase 5 of BOP's COVID-19 Action Plan purports to significantly decrease inmate movement by requiring that incarcerated individuals at every institution be

---

[54]     *See Something is Going to Explode*,
https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html

[55]     *Id.*

[56]     *See* BOP, *COVID-19 Action Plan: Phase 5*,
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 17, 2020) (Background on Phases 1-4).

[57]     *See* BOP, *Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool*,
https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited Apr. 17, 2020).

"secured in their assigned cells/quarters."[58]  But this plan does not appear to correct the defective screenings of staff, contractors or inmates, nor does it change the reality that individuals remain in close quarters—still sharing living space, bathrooms, showers, laundry, recreation areas, and computer and phone access.  In light of this evidence, waiting for FCI Gilmer to announce its first case will be waiting too long.

## II.     THIS COURT HAS JURISDICTION TO DECIDE THIS MOTION AND ANY FAILURE TO COMPLY WITH THE BOP'S EXHAUSTION REQUIREMENTS SHOULD BE EXCUSED.

Counsel submitted a compassionate release request with the Warden of FCI Gilmer for Mr. Jennings on April 18, 2020.  However, this Court need not wait to decide this motion.  This Court should excuse compliance with the BOP's administrative exhaustion requirements, which take at least 30 days and can go on much longer, given the documented and serious national emergency.  *See Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (quoting *Granberry v. Greer*, 481 U.S. 129, 134 (1987)) (recognizing that "exceptional circumstances of peculiar urgency" can excuse exhaustion).

The exhaustion requirement found in 18 U.S.C. § 3582(c)(1)(A) does not limit a federal court's jurisdiction to grant a reduction in sentence; it is a "claims processing" rule that "merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made.  It simply delineates the process for a party to obtain judicial review, not referring to the adjudicatory capacity of courts."  *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020).  Thus, it can be waived.  *Id*. at *3.  *See also*

---

[58]      *See COVID-19 Action Plan: Phase Five*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

*United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020) (same).

As many federal courts have now ruled, the exhaustion requirement contained in 18 U.S.C. § 3582(c) is not absolute, and it may be waived in certain extraordinary circumstances, which describes the threat posed by the COVID-19 pandemic. *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *2 (S.D.N.Y. Apr. 13, 2020); *Haney*, 2020 WL 1821988, at *4  ("in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly best served by permitting Haney to seek relief before the 30-day period has elapsed."); *United States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few weeks' delay carries the risk of catastrophic health consequences" for prisoner in high risk group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health conditions putting him in a high risk group for complications and death resulting from COVID-19, and fact that he was in a detention facility where prisoners live in crowded conditions); *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement where delay carried the risk of the vulnerable defendant contracting COVID-19); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the

exhaustion requirement of Section 3582(c)(1)(A)."); *see also Matter of Extradition of Toledo Manrique*, No. 19-MJ-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in the jail because that "may be too late").

This Court should waive the exhaustion requirement because Mr. Jennings's health and life would be at risk if it were to wait, and the BOP's likely response to his request may very well track the government's—that is, assurances that it is prepared to protect Mr. Jennings without proof that it can do so. *See United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) where the inmate had not filed a compassionate release request, finding that "requiring defendant to first seek relief through the [BOP] administrative process would be futile").

## III. THIS COURT SHOULD GRANT MR. JENNINGS COMPASSIONATE RELEASE BECAUSE HIS MULTIPLE CO-MORBIDITIES HEIGHTEN THE RISK OF SERIOUS COMPLICATIONS OR DEATH FROM COVID-19.

In opposition to Mr. Jennings's compassionate release motion in No. 18-cr-17, the government stated that a defendant's "condition or characteristic" and the COVID-19 pandemic may qualify as an "extraordinary and compelling reason" for compassionate release only if:

> (1) the inmate has a condition or characteristic that is a cognizable basis for compassionate release under the current criteria [citing Application Note 1 to Section 1B1.13], and that condition or characteristic also elevates the inmate's risk of becoming seriously ill from COVID-19 under the CDC guidelines; and
>
> (2) the inmate is more likely to contract COVID-19 in his or her particular institution than if released.

No. 18-cr-271 Gov't Opp. at 11-12. This parsimonious understanding of the compassionate release statute is incorrect, and, even if valid, Mr. Jennings qualifies under the government's own criteria.

*First*, because the Guidelines have not been amended post-First Step Act, "the most sensible interpretation of the Sentencing Commission's guidance in light of Congress's recent statutory amendments is that 'the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, *although it is not ultimately conclusive*.'" *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (emphasis added) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019). To limit any compassionate release only to those who already qualified under the Commission's guidance is nonsensical and more so during a pandemic. The COVID-19 virus did not read the Guidelines; there is no guarantee that it targets the same populations covered by the Guidelines' suggestions.

Take, for instance, diabetes. For reasons not yet understood, COVID-19 is especially deadly to those with diabetes, and yet as a general matter, most diabetics are able to manage their conditions quite well on a daily basis. Thus a diabetic may never have considered compassionate release before the COVID-19 pandemic and may now be fearing for his life. *See, e.g., United States v. Ben-Yhwh*, No. 1:15-cr-830-LEK, Dkt. No. 206 (D. Hawaii Apr. 13, 2020) (granting compassionate release and immediately releasing defendant with asthma and diabetes because his risk factors for COVID-19 present "high probability" of "catastrophic health consequences" if he continues to be detained). In this same way, even if Mr. Jennings's conditions were entirely under control before the pandemic—which they were not—Mr. Jennings would qualify for compassionate release because of the risks to his life and his health if he contracts COVID-19 while in custody.

*Second*, the requirement that a defendant be "more likely to contract COVID-19 in his or her particular institution than if released" is both upside-down and reflects dated guidance from Attorney General Barr to the BOP about home confinement—it is certainly nowhere in the compassionate release statutes or the Guidelines' policy statement aimed at this Court.  This purported requirement appears to be taken from Attorney General Barr's March 26, 2020 announcement of expanded home confinement, in which he stated that "[m]any inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care," and added "[w]e should not grant home confinement when doing so is likely to increase their risk of COVID-19," but only if "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19."[59]  But following criticism of this approach,[60] Attorney General Barr, in his April 3, 2020 memorandum, abandoned this

---

[59]     AG Barr, *Prioritization of Home Confinement as Appropriate Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.justice.gov/file/1262731/download ("March 26, 2020 Memorandum").

[60]     *See, e.g.,* Press Release, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893 ("Nadler & Bass Press Release") ("We are troubled by your statement that '[m]any inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.' While that may well be the case for some inmates, we hope this statement does not indicate that you believe that prison is a safe place for anyone to be during a pandemic. Quite the contrary, as already demonstrated by the death of a medically-compromised BOP prisoner and the growing numbers of infected persons in BOP facilities across the country. For instance, we are not aware that BOP facilities, as a whole, have 'ready access to doctors'; a 2019 report by DOJ's Office of the Inspector General found that 'staffing prisoners with qualified healthcare workers is a challenge for the BOP.' This is likely even more true at the present time, with large numbers of healthcare workers being deployed to battle COVID-19 outside the prison walls. In addition, the CDC have encouraged 'social distancing' and increased hygiene to prevent COVID-19. Unfortunately, many BOP facilities utilize close quarter housing, which makes it impossible to accomplish adequate distancing between prisoners. And, it is no secret that hygienic conditions are lacking in BOP facilities, as they are in prisons across the country. For all these reasons, the best way to ensure that our prisons do not become epicenters of this

formulation and instead indicated that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."[61]

In any event, in light of the incontestable evidence of how COVID-19 spreads (exponentially, by asymptomatic and presymptomatic alike), the way the spread can be mitigated (socially distancing at home and handwashing), and the rapidly rising numbers within the BOP, there should be a presumption that an inmate is more likely to contract COVID-19 in a prison facility than at home with family members.  It is simply a false narrative that there is an equal "possibility that defendant might, while incarcerated, contract a disease that is also present in the community at large," No. 18-cr-17 Gov't Opp. at 13, because when Mr. Jennings is released from prison, he will not be housed in a single building with the community at large, and will not use a shared toilet, shower, or sink with the community at large.

*Third*, even if the government's requirements were not overly limited and Mr. Jennings's conditions must fit within a Guidelines-recognized "extraordinary and compelling circumstance," Mr. Jennings would meet these criteria.  *See* U.S.S.G. § 1B1.13, appl. n. 1(A)(ii). Mr. Jennings's ischemic heart disease led to a heart attack in November 2019, for which he could not receive a pacemaker because of his diabetes and hypertension, so that he has been living precariously, needing a pacemaker but unable to get one.  He walks with a cane, cannot receive knee surgery because of his damaged heart, and requires both a bottom bunk and the ground

---

incredibly virulent, contagious, and deadly disease is to release as many people as possible." (internal citations omitted)).

[61]     AG Barr Memorandum, *Increasing Use of Home Confinement At Institutions Most Affected by COVID-19* (Apr. 3, 2020), https://www.justice.gov/file/1266661/download ("April 3, 2020 Memorandum")

floor of his facility.  The risks of heart attack increase with age, so that men 45 or older are more

likely to have a heart attack than younger men.[62]  Thus he is "experiencing deteriorating physical

[] health because of the aging process," and with the delay receiving a pacemaker, he very well

may have another heart attack from which he will not recover.  *See* U.S.S.G. § 1B1.13, appl. n.

1(A)(ii).  That the government believes he can perform self-care, No. 18-cr-17 Gov't Opp. at 13,

does not make it so:  one of the key reasons § 3582(c)(1)(A) was amended to allow inmates like

Mr. Jennings to bring their own motions before the court was because of Congress's

understanding that, too often, the BOP's assessment of an inmate's request for compassionate

release was "superficial"[63] and "short on both compassion and legal analysis."[64]  "Releasing a

prisoner who is for all practical purposes deserving of compassionate release during normal

times is all but mandated in the age of COVID-19."  *United States v. Resnik*, 2020 WL 1651508

(S.D.N.Y. Apr. 2, 2020); *see also United States v. Hammond*, No. 02-cr-294 (BAH), ECF No. 51

(Mem. Op. & Indicative Ruling) (Apr. 16, 2020) (providing indicative ruling that court will grant

compassionate release to inmate with 7 more years to serve whose age and health conditions,

along with COVID-19, were "extraordinary and compelling" reasons for his release, and his

release was "consistent with applicable policy statements issued by the Sentencing

Commission").

---

[62]   *See* Mayo Clinic, Heart attack- Risk Factors (last accessed 4/20/2020),
https://www.mayoclinic.org/diseases-conditions/heart-attack/symptoms-causes/syc-20373106.

[63]   *United States v. Haney*, No. 19-cr-00541, __ F. Supp. 3d __, 2020 WL 1821988 at *3
(S.D.N.Y., Apr. 13, 2020).

[64]   Ex. G (*United States v. Mitchell*, No. 4:09cr26-RH, ECF No. 144 at 6 (N. D. Fl., Feb. 3,
2020)).

*Fifth*, Mr. Jennings has a perfect storm of factors putting him most at risk for COVID-19 complications.  First, the fatality rate of COVID-19 is highest in men.  *See* Ex. C (Declaration of Chris Beyrer, Professor of Epidemiology, Int'l Health, & Medicine, Johns Hopkins School of Public Health) at ¶6.[65]  Second, it disproportionately affects African-Americans.[66]  Third, the CDC reports that it is especially harmful to those with serious heart conditions and diabetes,[67] while the World Health Organization reports that hypertension has emerged as a leading risk factor.[68]

Experts are only starting to understand why COVID-19 is so deadly in those with heart conditions.  Since the pandemic began, it has been widely known that COVID-19 damages the lungs by "inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down the organs essential for life."[69]  But now clinicians are recognizing

---

[65]     This declaration and the additional declarations by Dr. Marc Stern and Dr. Robert M. Greifinger were prepared in other cases, but their facts and recommendations apply to all high-risk individuals residing in detention facilities.

[66]     *See The coronavirus is infecting and killing black Americans at an alarmingly high rate*, https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows; *see also* Akilah Johnson & Talia Buford, *Early Data Shows African Americans Have Contracted and Died of Coronavirus at an Alarming Rate*, ProPublica (Apr. 3, 2020), https://www.propublica.org/article/early-data-shows-african-americans-have-contracted-and-died-of-coronavirus-at-an-alarming-rate.

[67]     *See* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[68]     WHO, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Ex. D (Declaration of Dr. Marc Stern, physician specializing in correctional health care) at ¶5.

[69]     Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* Washington Post (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-

that "the virus also may be causing heart inflammation, acute kidney disease, neurological

malfunction, blood clots, intestinal damage and liver problems."[70]   "Clinicians in China and New

York have reported myocarditis, an inflammation of the heart muscle, and, more dangerous,

irregular heart rhythms that can lead to cardiac arrest in covid-19 patients."[71]   This is the same

condition that Mr. Jennings was already diagnosed with when he was last before this Court; since

then he has experienced a heart attack and is diagnosed with ischemic heart disease.

Diabetes and hypertension are also leading co-morbidities for COVID-19.  The American

Association of Clinical Endocrinologists reports that "[r]ecent studies have shown that of those

hospitalized for severe disease, 22.2% to 26.9% reported living with diabetes," and "[d]iabetes

and high glucose levels are associated with increased complications, respiratory failure and

mortality in hospitalized patients with COVID-19."[72]   Although there has recently been some

debate about whether hypertension, if present by itself, is a risk factor, experts agree that, when

present along with other underlying conditions, hypertension is undoubtedly a co-occurring

---

damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-
13e1ae0a3571_story.html.

[70]      *Id.*

[71]      *Id.*

[72]      American Association of Clinical Endocrinologists, *AACE Position Statement:
Coronavirus (COVID-19) and People with Diabetes (Updated March 18, 2020),*
https://www.aace.com/recent-news-and-updates/aace-position-statement-coronavirus-covid-19-
and-people-diabetes-updated

condition for those most harmed by the virus.[73]  In fact, the CDC recently reported that, of those

COVID-19 patients hospitalized who had underlying conditions, 50 percent had hypertension.[74]

Should Mr. Jennings contract COVID-19, the results may be devastating.  "The time

course of the disease can be very rapid.  Individuals can show the first symptoms of infection in

as little as two days after exposure and their condition can seriously deteriorate in as little as five

days (perhaps sooner) after that."  Ex. D (Declaration of Dr. Marc Stern) at ¶4.  "Vulnerable

people who are infected by the COVID-19 virus can experience severe respiratory illness, as

well as damage to other major organs.  Treatment for serious cases of COVID-19 requires

significant advanced support, including ventilator assistance for respiration and intensive care

support."  *Id.* at ¶6.  Ventilators are currently in short supply in the United States; if Mr. Jennings

falls ill, there is no guarantee that he will have access to one.[75]

There is currently no vaccine to prevent COVID-19 and no known cure or antiviral

treatment for COVID-19.  "*Social distancing and hand hygiene* are the only known ways to

prevent the rapid spread of COVID-19."  *See* Ex. E (Declaration of Robert B. Greifinger, MD) at

¶8 (emphasis added).  But the availability and access to soap varies by institution, and although

---

[73]     Rob Stein, *High Blood Pressure Not Seen As Major Independent Risk For COVID-19*, NPR (Mar. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/20/818986656/high-blood-pressure-not-seen-as-major-independent-risk-for-covid-19.

[74]     Shikha Garg et al, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, CDC (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[75]     *See* Sarah Kliff, et al., *There Aren't Enough Ventilators to Cope With the Coronavirus*, N.Y. Times (Mar. 26, 2020), https://www.nytimes.com/2020/03/18/business/coronavirus-ventilator-shortage.html.

alcohol-based hand sanitizers are a proven way to decrease transmission,[76] in prison, they are generally considered contraband.[77]   In any event, even if Mr. Jennings were able to wash his hands assiduously in BOP custody, he simply cannot socially distance in prison.  As the CDC explains, the risk of exposure to COVID-19 increases in "crowded, closed-in settings with little air circulation if there are people in the crowd who are sick," and people who are at high risk for severe illness should "avoid crowds," "stay home as much as possible to further reduce your risk of being exposed," and "avoid touching high-touch surfaces."[78]  "Confined to a small cell where social distancing is impossible, [Mr. Jennings] cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."  *Perez*, 2020 WL 1546422, at *4.  Therefore, "release from detention is a critically important way to meaningfully mitigate" the high risk of serious illness or death for Mr. Jennings.  *See* Ex. D at ¶9.

Releasing Mr. Jennings will not only protect him from the risk of death and severe complications from COVID-19, but will protect the prison and the community.  Experts agree that the "release of detainees who present a low risk of harm to the community is [] an important mitigation strategy" for FCI Gilmer and the community as a whole, because, by shrinking the inmate population, "it allows for greater social distancing, which reduces the chance of spread if

---

[76]   CDC, *How to Protect Yourself & Others* (last visited April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ("if soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol.").

[77]   *See Sick Staff*, https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federalinmates-as-coronavirus-hits (noting access to hand sanitizer varies by facility).

[78]   *See* CDC, *Get Ready for COVID-19* (Mar. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html & CDC, *Steps to Prevent Getting Sick* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html.

virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees." *See* Ex. D at ¶9.

Indeed, realizing the danger of COVID-19 in detention facilities, courts all over the country, in various procedural postures, are acknowledging the uncontroverted evidence that it is safer for the entire community if inmates, like Mr. Jennings, who are at high-risk of death or injury from the virus, and who do not pose any immediate danger to others, are released. *See, e.g., Karr v. Alaska*, 2020 WL 1456469, at *2 (Ct. of App. Alaska Mar. 24, 2020) (citations omitted) ("Incarcerating a defendant under conditions that do not permit compliance with widespread health directives designed to halt the spread of the virus poses significant health risks not only to other inmates and to correctional facility staff, but also to the rest of the public.").[79]

Many courts have granted compassionate release motions based, at least in part, on the COVID-19 crisis. *See, e.g.*, *United States v. Hammond*, No. 02-cr-294 (BAH), ECF No. 51 (Mem. Op. & Indicative Ruling) (Apr. 16, 2020) (providing indicative ruling that court will grant compassionate release to Vietnam veteran with 7 more years to serve whose age and health conditions put him at increased risk from COVID-19); *United States v. Young*, No. 2:00-cr-

---

[79] *See also United States v. Underwood*, Case No. 8:18-cr-201-TDC, ECF No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future"); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19").

00002, 2020 WL 1047815, at *9 (M.D. Tenn. Mar. 4, 2020) (granting compassionate release to Vietnam vet who was 72 years old, had served 19 years of his 92-year sentence, and suffered from kidney disease, diabetes, high cholesterol and blood pressure, and cataracts); *United States v. Andre Williams*, No. 3:04cr95/MCR, Order at 7, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (recognizing that an outbreak of COVID-19 in Williams' facility would likely have "fatal consequences for him" and granting compassionate release to defendant who had served 15 years of a life sentence for repeated (at least six prior) armed bank robberies); *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) ("Because Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release."); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding the COVID-19 "threat . . . constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served"); *United States v. Foster*, No. 1:14-cr-324-JEJ, Mem. & Order at 7, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. McPherson*, Case No. 3:94-cr-5708, Dkt. No. 209 (W.D. Wash. Apr. 14, 2020) (releasing defendant serving sentence on stacked § 924(c) based on injustice of sentence and risk factors for COVID-19, noting that no "civilized society" could permit continued incarceration under these circumstances); *United States v. Tran*, 8:08-cr-197-DOC,

Dkt. No. 405 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release in light of BOP's

inability to protect vulnerable inmates from COVID-19).[80]

When this Court sentenced Mr. Jennings, it did not "intend for that sentence to 'include a

great and unforeseen risk of severe illness or death' brought on by a global pandemic." *United*

*States v. Zukerman*, No. 1:16-cr-194-AT, Dkt. No. 116 (Apr. 3, 2020) ("The severity of

Zukerman's conduct remains unchanged. What has changed, however, is the environment where

Zukerman is serving his sentence."). "These are not normal times[.]"  *United States v. Gonzales*,

2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (granting compassionate release to 60-year

old defendant with underlying health condition).  The exponential infection rate of COVID-19

and high mortality rate for those of Mr. Jennings's age and with his conditions, coupled with the

---

[80]     *See also United States v. Compagna*, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020)
("Defendant's compromised immune system, taken in concert with the COVID-19 public health
crisis, constitutes an extraordinary and compelling reason to modify Defendant's sentence on the
grounds that he is suffering from a serious medical condition that substantially diminishes his
ability to provide self-care within the environment of the RCC."); *United States v. Edwards*, No.
6:17-cr-003-NKM, Order at 10, ECF No. 134 (W.D. Va. Apr. 2, 2020) (finding defendant's
already strong case for compassionate release based on terminal cancer "further substantiated
with a particularized showing that he is susceptible to contracting COVID-19, and that he is at
high risk if he contracts it"); *United States v. United States v. Trent*, Case No. 16-cr-178, ECF
No. 106 (N.D. Cal. Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United
States v. Plunk*, Case No. 3:94-cr-36-TMB (D. Alaska Apr. 9, 2020) (granting compassionate
release in light of COVID-19); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8,
2020) (granting compassionate release for defendant at serious risk from COVID-19); *United
States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and
medical problems justifies 7-month reduction in sentence); *United States v. Colvin*, No. 3:19-cr-
179-JBA, Ruling Granting Def.'s Mot. for Comp. Rel., ECF No. 38 (D. Conn. Apr. 2, 2020);
*United States v. Huneus*, No. 1:19-cr-10117-IT, Order, ECF No. 642 (D. Mass. Mar. 17, 2020)
(granting compassionate release "in light of the national state of emergency" and defendant's
"unique health circumstances"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar.
24, 2020); *United States v. Marin*, No. 15-cr-252, Min. Order, ECF. No. 1326 (E.D.N.Y. Mar.
30, 2020); *United States v. West*, No. 1:17-cr-390-AT-1, Corrected Order (Redacted), ECF No.
53 (N.D. Ga. Mar. 30, 2020); *United States v. Powell*, No. 94-cr-316 (ESH), ECF No. 96
(Emergency Mot.), ECF No. 97 (Order) (Mar. 28, 2020) (granting unopposed motion for
compassionate release in light of COVID-19).

virtually certain inability of the BOP to address a surge in cases, make clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case. Accordingly, the Court should exercise its discretion to order Mr. Jennings's immediate release from prison.

## IV.    THE HOLLOW PROMISE OF THE EXPANDED HOME CONFINEMENT PROGRAM.

As part of the government's promise that the "BOP has instituted unprecedented safety regimens to ensure inmate health," it touts the recently expanded home confinement program. No. 18-cr-17 Gov't Opp. at 9. Yet nowhere does it address whether Mr. Jennings has been considered or is eligible under such a program, and there is every reason to believe that the BOP's home confinement program is insufficient either by design or in its implementation. Supposedly, "[i]nmates do not need to apply to be considered for home confinement" and "[c]ase management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General,"[81] but upon counsel's inquiry about the expanded home confinement program, Mr. Jennings reported that he knew nothing about it; staff at FCI Gilmer have not said a single word to inmates about its availability.

First, the program erects a complex set of procedural and logistical hurdles to home confinement that are largely arbitrary, bear little nexus to the current public health crisis, and will disparately harm persons of color. Take, for instance, the deprioritization of individuals with who have incurred a BOP violation within the past year. Mr. Jennings has had zero disciplinary incidents in his entire time incarcerated. For others, however, this criteria is simply arbitrary and divorced from any valid public health or public safety consideration, when these incidents can be

---

[81]     BOP, *Update on COVID-19 and Home Confinement* (last accessed 4/20/2020 at 12:11 p.m.), https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

minor, non-violent events, and especially given the minimal due process in BOP disciplinary actions and the likely varied enforcement practices from one BOP facility to another.

Or consider the deprioritization of those with PATTERN risk scores higher than minimum (the lowest level out of minimum, low, medium, and high).  Counsel has no information about Mr. Jennings's PATTERN score, but what the recidivism score has to do with the risk to a vulnerable inmate of remaining imprisoned during a pandemic is deeply in doubt. The PATTERN recidivism score was created pursuant to the First Step Act as a means for the BOP to determine an inmate's score, provide that inmate with programming commensurate with that score, and allow that inmate to complete the programming *as an incentive to receive earned time credits towards early release*.[82]  In other words, a tool developed to help inmates rehabilitate and leave prison early is being deployed to *deny* early release to home confinement (or compassionate release, according to the government).  But "it is still an incomplete tool [and] it has yet to be independently validated, as required by the First Step Act."[83]  In fact, "many questions remain about PATTERN's validity because of possible racial/ethnic and gender bias and because of the tool's overemphasis on static factors such as criminal history."[84]  Moreover, the very congressional leaders behind the First Step Act have told Attorney General Barr that

---

[82]     DOJ, *Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation* (Jan. 15, 2020), https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act.

[83]     *See* Press Release, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893.

[84]     *See id.*

"PATTERN was created for an entirely different purpose than for assessing whether prisoners should be released during a pandemic" and they "urge[d] BOP *not* to use a prisoner's PATTERN score as a consideration for whether they should be released to home confinement during the COVID-19 pandemic."[85]

Second, Attorney General Barr issued two memoranda on expanded home confinement; his March 26, 2020 memorandum laid out a set of criteria for who should be given "priority treatment," while the April 3, 2020 memorandum expanded that cohort by declaring emergency conditions and explaining that "Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."[86] Yet counsel across the nation are confronting BOP institutions stating that those inmates with, for instance, a disciplinary issue in the past year or a medium PATTERN risk score are flatly *ineligible* for consideration.  BOP institutions are themselves improperly applying the expanded home confinement program, and there is no guarantee that Mr. Jennings will be considered for it.

In sum, granting Mr. Jennings compassionate release "would [not] undercut the strict criteria BOP employs to determine individual inmates['] eligibility for compassionate release and home confinement."  Gov't Opp. at 11.  Granting home confinement for the remainder of a defendant's sentence is a province of the BOP; granting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) is the province of this Court.  The jurisdiction is different; the criteria are

---

[85]     *See id.*

[86]     *Compare* March 26, 2020 Memorandum, https://www.justice.gov/file/1262731/download, with April 3, 2020 Memorandum, https://www.justice.gov/file/1266661/download.

different; and the BOP's decision about home confinement does not, and should not, substitute for this Court's reasoned decision about compassionate release.

## V.     MR. JENNINGS IS NOT A DANGER TO THE COMMUNITY AND HIS CONTINUED INCARCERATION IS GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING.

The § 3553(a) factors also support compassionate release.  Mr. Jennings has already been significantly punished and is not a danger to the community.  Because of his health problems, Mr. Jennings "has served much of his sentence while seriously ill and in physical discomfort." *United States v. Andre Williams*, No. 3:04cr95/MCR, Order at 11, ECF No. 91 (N.D. Fla. Apr. 1, 2020).  "This means that his sentence has been significantly more laborious than that served by most inmates.  It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)."  *Id.* (quoting *United States v. McGraw*, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019)).

Mr. Jennings's poor physical condition and health decline also realistically forecloses a probability of recidivism.  *See Bellamy*, 2019 WL 3340699, at *6 ("[T]he Court doubts that Bellamy presents a danger to any person or the community in his present state.  He is wheelchair-bound and requires assistance to complete most of his daily activities.").  Given "[Mr. Jennings's] physical impairments," he does not pose "any significant risk to the community at this time."  *United States v. York*, 2019 WL 3241166, at *7 (E.D. Tenn. July 18, 2019) ("The Court cannot fathom, and no party has attempted to explain, how Defendant [who is disabled, wheelchair-bound, and 60 years old] could pose a danger to the community in light of his chronic physical impairments."); *see also Muniz*, 2020 WL 1540325, at *2 ("Because of Defendant's serious medical conditions and the length of time already served [(approximately ten years)], the Court is persuaded that Defendant will not pose a threat to the community.").

Mr. Jennings has had no disciplinary issues while imprisoned, and he did not display violence in his 2017 or 2006 bank robberies. *See* No. 18-cr-17 Def. Sent'g Mem. at 4, ECF No. 20. "Any limited risk can be mitigated by supervision." *Bellamy*, 2019 WL 3340699, at *6. Indeed, Mr. Jennings will be on strict conditions of supervision upon his release for the 3-year period of time ordered in No. 18-cr-17 (concurrent to the 12 months of supervised release imposed in this case). *See* No. 18-cr-17 Judgment, ECF No. 23; Judgment on Revocation (Jul. 17, 2018), ECF No. 41. A reduction in Mr. Jennings's sentence to time-served is sufficient to serve the purposes of punishment under § 3553(a)(2); and, given his chronic health conditions, "a longer sentence would be greater than necessary to serve those purposes." *Beck*, 2019 WL 2716505, at *12.

## VI.   MR. JENNINGS'S RELEASE PLAN.

Upon his release, Mr. Jennings will live with his son, who is a tenured professor at Howard Community College and Coppin State University. His son lives by himself in Baltimore, Maryland and is in excellent health. His son has extra rooms in his home, and therefore Mr. Jennings will be able to socially distance in an empty room for a 14-day quarantine period. Because of his intention to self-isolate, Mr. Jennings requests that this Court amend his conditions of supervised release so that he need not report in person to the Probation Department, and to instead allow him to contact the Probation Department by telephone within 72 hours of his release.

Because of Mr. Jennings's military service, he is able to utilize the Veterans Administration's "Health care for Re-Entry Veterans" Program, which includes "[r]eferrals and linkages to medical, mental health and social services, including employment services on

release" and "[s]hort-term case management assistance on release.[87]  His PSR makes clear that

he was treated at the VA Medical Center prior to incarceration in the instant case, PSR ¶115, and

he will be able to access those benefits again.

## CONCLUSION

"People do not stop being human the day they are sentenced.  Although some have made

terrible choices or engaged in reprehensible behavior, the sentence they received for their crime

did not include contracting COVID-19 and death."[88]  For the foregoing reasons, Mr. Jennings

respectfully requests that this Court grant his motion, reduce his sentence to time-served, and

order his immediate release.

A proposed order is attached, which includes the same conditions of supervised release

provided for Mr. Jennings in No. 18-cr-17.  Mr. Jennings respectfully requests that this Court

issue an amended judgment on revocation, as the BOP has indicated in some (though not all)

cases that it requires such an amended judgment prior to processing compassionate release

orders.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500

---

[87]     *See* https://www.benefits.va.gov/persona/veteran-incarcerated.asp;
https://www.va.gov/homeless/reentry.asp.

[88]     DA Rachael Rollins, *Statement of Suffolk County District Attorney Rachael Rollins on today's hearing before the Supreme Judicial Court* (Mar. 31, 2020),
https://www.suffolkdistrictattorney.com/press-releases/items/2020/3/31/statement-of-suffolk-county-district-attorney-rachael-rollins-on-todays-hearing-before-the-supreme-judicial-court.